UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-21924-GAYLES

**TOWN OF SOUTHWEST RANCHES,**
          **Plaintiff,**

        v.

**U.S. DEPARTMENT OF HOMELAND**
**SECURITY, IMMIGRATION & CUSTOMS**
**ENFORCEMENT,**
          **Defendant.**
                                                  /

**<u>ORDER</u>**

**THIS CAUSE** comes before the Court on cross-motions for summary judgment filed by the Plaintiff, the Town of Southwest Ranches [ECF No. 29], and the Defendant, the U.S. Department of Homeland Security, Immigration and Customs Enforcement [ECF No. 27]. In this action, brought pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, the Plaintiff seeks judicial review of the Defendant's denial of its request to depose one current Immigration and Customs Enforcement official and one former official in another case currently being litigated in Florida state court. The Court has carefully considered the briefs, the administrative record, and the applicable law. For the reasons that follow, the Defendant's Motion for Summary Judgment shall be granted and the Plaintiff's Motion for Summary Judgment shall be denied.

**I.    BACKGROUND**

    **A.    *The Underlying Litigation***

The facts underlying the parties' motions are largely not in dispute.[1] The underlying cause

---

[1] "Because there are cross-motions for summary judgment on the exact same issues, it is impossible to merely cast the facts 'in the light most favorable to the non-movant,' as required by the legal standard governing summary judgment motions, *see infra* Part II, as each side is both movant **and** non-movant. The court finds it impractical and unnecessary to set out different sets of facts, for the same situation, when the parties have filed cross-motions

of action in this case is a state court breach of contract action between the Town of Southwest Ranches (the "Town"),[2] the Plaintiff here, and the City of Pembroke Pines (the "City"). DHS Statement of Undisputed Facts ("DHS Statement") ¶ 1.[3] That litigation, *Town of Southwest Ranches v. City of Pembroke Pines*, No. 12-28819—currently pending in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida—involves an alleged plan by the U.S. Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), the Defendant here,[4] for a proposed immigration detention center to be built in Southwest Ranches. Town Statement of Material Facts ("Town Statement") ¶ 2. The Town alleges that the City's breaches of two separate contracts were a substantial factor in causing DHS to cancel the proposed

---

for summary judgment on the same counts, discussing the same issues, and the same nuances of law. It benefits neither the court nor the parties. . . . To make a decision regarding each motion for summary judgment, the court will rely on those facts in Plaintiff's motion for summary judgment that are undisputed and supported by the record and Plaintiff's attached [statements of facts], those facts in Defendant's motion for summary judgment that are undisputed and supported by the record and Defendant's attached [statements of facts], as well as the evidence the parties have placed on the record." *Ferox, LLC v. ConSeal Int'l, Inc.*, — F. Supp. 3d —, 2016 WL 1242165, at *1 n.2 (S.D. Fla. Mar. 30, 2016) (citations and internal quotation marks omitted).

[2] The Court will use "Town" to refer to the Plaintiff in this action, but will use "Southwest Ranches" to refer to the actual geographical location.

[3] Southern District of Florida Local Rule 56.1 requires that "[a] motion for summary judgment and the opposition thereto shall be accompanied by a statement of material facts as to which it is contended that there does not exist a genuine issue to be tried or there does exist a genuine issue to be tried, respectively," S.D. Fla. L.R. 56.1(a). A statement shall, inter alia, "[b]e supported by specific references to pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court." Id. R. 56.1(a)(2). Furthermore, a statement of material facts submitted in opposition to a motion for summary judgment "shall correspond with the order and with the paragraph numbering scheme used by the movant." Id. R. 56.1(a). Local Rule 56.1(b), which governs the effect of failure to controvert a statement of undisputed facts, provides: "All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." *Id.* R. 56.1(b).

DHS filed its Statement of Undisputed Material Facts as required with its motion for summary judgment [ECF No. 28], which the Court finds is supported as required and complies with all requirements of Local Rule 56.1. As for the Town, however, although it filed its own Statement in conjunction with its own motion for summary judgment [ECF No. 30], it filed no response to DHS's statement in conjunction with its response to DHS's motion (DHS, by contrast, did file a response to the Town's principal statement [ECF No. 34.].). Therefore, pursuant to Local Rule 56.1(b), all facts contained in DHS's Statement are hereby deemed admitted. *See Wise v. City of Lauderhill*, No. 15-60686, 2016 WL 3747605, at *1 n.3 (S.D. Fla. July 13, 2016); *cf., e.g.*, *SEC v. Mannion*, No. 10-3374, 2013 WL 1291621, at *2 n.1 (N.D. Ga. Mar. 25, 2013) (analyzing cross-motions for summary judgment under the Northern District of Georgia's analogous rule governing statements of undisputed material facts, where the parties both filed responses to the corresponding initial fact statements)

[4] The Defendant is referred to as both "DHS" and "ICE" throughout the briefs and relevant documents in this litigation. For ease of reference, the Court will refer to the Defendant as "DHS," unless a distinction between DHS as the Department and ICE as the Agency must be made.

immigration detention center. *Id.* ¶ 3; *see also* DHS Resp. to Plaintiff's Statement of Material Facts ("DHS Response") ¶ 3.

### B. *DHS's* Touhy *Regulations*

In *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), the Supreme Court upheld regulations that allow a federal agency to restrict its employees from testifying about information acquired in their official capacities in private litigation as to which the United States is not a party. "[These] regulations are commonplace among . . . federal agencies, and have been upheld by the courts." *Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1197 (11th Cir. 1991). Thus, "a federal employee may not be compelled to obey a subpoena contrary to his federal employer's instructions under valid agency regulations." *Id.* (quoting *Boron Oil Co. v. Downie*, 873 F.2d 67, 73 (4th Cir. 1989)). These regulations are commonly known as *Touhy* regulations, and requests implicating the regulations are known as *Touhy* requests.

"ICE is subject to the *Touhy* regulations promulgated by [DHS], codified at 6 C.F.R. sections 5.41-.49." *City of Pembroke Pines v. ICE*, 141 F. Supp. 3d 1330, 1333 (S.D. Fla. 2015). Specifically, 6 C.F.R. § 5.48(a) sets forth the concerns DHS officials shall consider in deciding whether to comply with or deny a demand or request:

(1) Whether such compliance would be unduly burdensome or otherwise inappropriate under the applicable rules of discovery or the rules of procedure governing the case or matter in which the demand arose;

(2) Whether compliance is appropriate under the relevant substantive law concerning privilege or disclosure of information;

(3) The public interest;

(4) The need to conserve the time of Department employees for the conduct of official business;

(5) The need to avoid spending the time and money of the United States for private purposes;

(6) The need to maintain impartiality between private litigants in cases where a substantial government interest is not implicated;

  (7) Whether compliance would have an adverse effect on performance by the Department of its mission and duties; and

  (8) The need to avoid involving the Department in controversial issues not related to its mission.

6 C.F.R. § 5.48(a). Moreover, if a demand or request contains any of the characteristics set forth in 6 C.F.R. § 5.48(b), "compliance will not ordinarily be authorized" if:

  (1) Compliance would violate a statute or rule of procedure;

  (2) Compliance would violate a specific regulation or Executive order;

  (3) Compliance would reveal information properly classified in the interest of national security;

  (4) Compliance would reveal confidential commercial or financial information or trade secrets without the owner's consent;

  (5) Compliance would reveal the internal deliberative processes of the Executive Branch; or

  (6) Compliance would potentially impede or prejudice an on-going law enforcement investigation.

*Id.* § 5.48(b).

  C. *The Town's* **Touhy** *Requests*

In the course of the underlying litigation, the Town identified two individuals—Mark Moore, ICE Field Office Director, and Gary Mead, former ICE Executive Associate Director—who had knowledge and information relating to the proposed project. DHS Response ¶ 4. On August 19, 2014, the Town sent a written *Touhy* request, seeking authorization "to contact, interview and/or depose present or former department employees" in the underlying state court breach of contract litigation." DHS Statement ¶ 5 (quoting Am. Compl. Ex. C ("August 19 Letter")). Specifically, the Town sought to depose Mead and Moore regarding "the fact that the water and sewer problems led to [DHS's] decision to forego [sic] proceeding with the Detention Center in . . . Southwest Ranches." Town Statement ¶ 5 (quoting August 19 Letter). On August 25, 2014, DHS responded to the Town's *Touhy* request. DHS Statement ¶ 6. In the response, it identified the controlling *Touhy* regulatory procedures, 6 C.F.R. §§ 5.44 and 5.45, and the *Touhy* regulatory

4

factors to be considered, 6 C.F.R. § 5.48, and denied the Town's request. DHS Statement ¶ 7.

On September 3, 2014, the Town sent another *Touhy* request, within a reply to DHS's denial. Town Statement ¶ 7. In it, the Town offered to depose only Mead, who was no longer an ICE employee. *Id.* (quoting Town Mot. Ex. D). DHS denied the Town's second request by a letter dated September 15, 2014. DHS Response ¶ 9 (citing Town Mot. Ex. E). In denying the request, DHS again identified the controlling *Touhy* regulatory procedures and the *Touhy* regulatory factors to be considered. DHS Statement ¶ 7.

On October 30, 2014, the Mayor of Southwest Ranches, Jeffrey Nelson, wrote to DHS, asking that it reconsider its decision. Town Statement ¶ 10 (citing Town Mot. Ex. F). On March 18, 2015, DHS explained that the agency's decision stands. DHS Response ¶ 11 (citing Town Mot. Ex. G).

D.     *Lawsuits by the Town and the City*

On May 20, 2015, the Town filed the instant lawsuit, challenging DHS's denial of the Town's *Touhy* request under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. DHS Statement ¶ 8. Approximately two weeks later, on June 2, 2015, the City brought its own separate action against DHS seeking judicial review under the APA of DHS's denial of the City's identical *Touhy* request to depose Mead and Moore, as well as another ICE employee. Town Statement ¶ 11. On October 19, 2015, Judge Altonaga (the presiding judge in the City's lawsuit) granted DHS's motion to remand the case for reconsideration. *Id.* ¶ 15. Three months later, on January 19, 2016, DHS and the City filed a Joint Stipulation of Dismissal in the City's lawsuit, notifying the court that the parties had "resolved and settled th[e] case." *Id.*

In this case, on September 30, 2015, DHS filed an unopposed motion to stay and hold the case in abeyance pending ICE's reconsideration of its previous denial, [ECF No. 12], which this Court granted on October 2, 2015 [ECF No. 13].

### E. *DHS's Final Agency Decision Letter*

On November 10, 2015, DHS sent the Town its final agency decision letter, in which it again declined to authorize the Town's requests to depose Mead and Moore. [ECF No. 20-1] (the "Final Decision Letter"). DHS based its decision on four different justifications, three of which invoked one or more of DHS's governing *Touhy* regulations. First, authorizing the Town's request "would reveal the internal deliberative processes" of the agency. *See generally* Final Decision Letter at 12-14 (citing 6 C.F.R. § 5.48(b)(5)). Second, authorizing the Town's request "would be contrary to [ICE's] need to maintain impartiality between private litigants in cases where a substantial government interest is not implicated, and the need to avoid involving [DHS] in controversial issues not related to its mission." *See generally id.* at 14-18 (citing 6 C.F.R. § 5.48(a)(6), (8)). Third, authorizing the Town's request would be unduly burdensome, have an adverse effect on DHS's performance of its mission and duties, be contrary to ICE's needs to conserve its employees time for official business and to avoid spending United States money for private purposes. *See generally id.* at 18-21 (citing 6 C.F.R. § 5.48(a)(1), (4), (5), (7)). And fourth, the Town had not established relevance or a demonstrated need for the information it sought, and that information could be obtained from a less burdensome source, *i.e.*, Mayor Nelson. *See generally id.* at 21-23. As a final note, DHS stated that it was "willing to discuss possible alternatives to [the Town's] request for in-person testimony, such as the provision of a written affidavit focused on facts that may be relevant to your underlying litigation." *Id.*

### F. *Mead Declaration and Subsequent Affidavit*

In response to similar *Touhy* requests made by the City, DHS denied authorization of the City's requests on reconsideration in a denial letter dated November 25, 2015. DHS Statement ¶ 12. DHS offered the City the same opportunity for the provision of a written affidavit as it offered to the Town. *Id.* ¶ 13. Unlike the Town's request to change or add factual information to the proposed

6

affidavit, the City agreed to accept the affidavit without substantive alterations. *Id.* ¶¶ 14-15.

On January 12, 2016, DHS authorized and issued a declaration from Gary Mead (the "Declaration"), which articulates several factors which each contributed to DHS's decision not to pursue an agreement for the contracting and construction of a new detention facility in Southwest Ranches in 2012, including "[o]pposition by government officials in City of Pembroke Pines." *Id.* ¶¶ 16-18. The City filed this declaration in the underlying litigation, but the Town argued that the declaration was not admissible in a Florida state court action, so DHS authorized and issued a notarized copy of Mead's declaration entitled "Affidavit of Gary Mead" (the "Affidavit"). Town Statement ¶ 19; DHS Response ¶ 19. The Affidavit is substantively identical to the Declaration. DHS Response ¶ 20.

\*   \*   \*

The parties have filed cross-motions for summary judgment. The Town argues that DHS's November 10, 2015, final decision denying its *Touhy* requests should be overturned because it was arbitrary, capricious, or otherwise unlawful. DHS, on the other hand, argues that its decision was reasonable, was based on the relevant *Touhy* regulations, and should stand.

## II. LEGAL STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. —, 134 S. Ct. 1861, 1866 (2014) (per curiam) (quoting Fed. R. Civ. P. 56(a)) (internal quotation marks omitted). By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). An issue is "genuine" when a reasonable

trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party in light of his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2016). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).

"Where the material facts are undisputed and all that remains are questions of law, summary judgment may be granted." *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122, 1138 (11th Cir. 2016). The Court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *SEC v. Monterosso*, 756 F.3d 1326, 1333 (11th Cir. 2014). However, to prevail on a motion for summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its behalf." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

### III.  DISCUSSION

#### A.  *The Administrative Procedure Act*

Section 702 of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statue, is entitled to judicial review thereof." 5 U.S.C. § 702. In reviewing an agency action, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). "[U]nder this standard, a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute. . . . The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Nat'l Min.*

*Ass'n v. Sec'y, U.S. Dep't of Labor*, 812 F.3d 843, 865 (11th Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983)). Consequently, "a party seeking to have a court declare an agency action to be arbitrary and capricious carries a heavy burden indeed." *Legal Envtl. Assistance Found. v. EPA*, 276 F.3d 1253, 1265 (11th Cir. 2001) (internal quotation omitted); *see also Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996). In the context of judicial review of the denial of a *Touhy* request, if the reviewing court finds that the agency considered the relevant factors and arrived at a rational conclusion, then the court should not find the agency's decision to be arbitrary and capricious. *Westchester Gen. Hosp., Inc. v. Dep't of Health & Human Servs.*, 443 F. App'x 407, 410 (11th Cir. 2011) (per curiam).

    **B.**    ***DHS's Denial of the Town's* Touhy *Request Was Not Arbitrary and Capricious***

The Court has reviewed each of the justifications DHS provided and concludes that the agency considered each of the relevant governing *Touhy* factors and arrived at a rational conclusion in its final denial of the Town's *Touhy* request.

    **1.**    **Deliberative Processes of the Agency**

First, the Court agrees that the Town's request would reveal the deliberative processes of the agency. Under 6 C.F.R. § 5.48(b)(5), "compliance will not ordinarily be authorized" where such compliance "would reveal the internal deliberative processes of the Executive Branch." In its Final Decision Letter, DHS stated that the Town's request—seeking the "why" behind the decision not to enter into a legal agreement with the Town—sought information that was "completely and exclusively pre-decisional, deliberative information of which the Agency would not normally authorize release," and "is precisely the type of internal deliberative processes and communications, the weighing of different factors and considerations, and collective strategic decision-making contemplated against disclosure by 6 C.F.R. § 5.48(b)(5)." *Id.* at 13. As DHS provided in its Final Decision Letter, the Town's request sought information regarding the reasons

9

*why* it decided not to move forward with the proposed detention facility; thus, any reasoning sought by the Town would necessarily be pre-decisional. Such information would reveal the agency's weighing of different factors and considerations, as well as the collective strategic decision-making contemplated against disclosure. Allowing the deposition of agency personnel would certainly impair and hinder the free and frank exchange of ideas, especially in a context where the agency seeks to work with, and select from, numerous interested local governments to further its law enforcement mission. *See id.*

The Court finds that this rationale is reasonable and was based on relevant factors. Simply put, the Town's request seeks additional information as to the reasoning behind the Agency's decision, which would ultimately "reveal the internal deliberative processes," 6 C.F.R. § 5.48(b)(5), and which, under DHS's *Touhy* regulations, is an appropriate basis for the denial of the Town's request. Thus, the Court cannot say that DHS's decision was arbitrary, capricious, or a clear error of judgment.

The thrust of the Town's argument in favor of overturning DHS's denial is that DHS, by providing the Mead Declaration and Affidavit to the City, "selectively revealed its deliberative process as to the reason (or reasons) it decided not to go ahead with the planned detention center" and thereby contradicted the *Touhy* factors it previously relied on to deny the Town's request and waived its "deliberative process privilege." Town Mot. at 6 (emphasis removed). As an initial matter, the Court need not address the Town's argument regarding the "deliberative process privilege" (DHS's version of which is found at 6 C.F.R. § 5.48(a)(2)) or any waiver thereof, because DHS did not invoke this regulation in denying the Town's request. DHS and its agencies often assert the deliberative process privilege in denying requests for documents and/or testimony, where

it deems such an assertion appropriate.[5] It did not do so here, as it relied instead on the separately codified 6 C.F.R. § 5.48(b)(5), which permits denial of a *Touhy* request where compliance therewith "would reveal the internal deliberative processes of the Executive Branch." The Court will not engage in an analysis of the Town's claimed impropriety of a privilege that was never advanced by DHS in the first place. *Cf., e.g.*, *Agency Pub. Warehousing Co. K.S.C. v. Dep't of Def.*, 110 F. Supp. 3d 215 (D.D.C. 2015) (APA review of a decision by the Defense Logistics Agency, an agency of the Department of Defense, where the agency claimed specifically that its denial of a *Touhy* request was predicated, *inter alia*, on the deliberative process privilege); *SEC v. Selden*, 445 F. Supp. 2d 11, 12 n.3 (D.D.C. 2006) (Food and Drug Administration filed motion to quash subpoenas because, *inter alia*, the subpoenas did not comply with the FDA's *Touhy* regulations and, separately, the requested documents were "exempt from public disclosure by the deliberative process privilege").[6]

Turning now to the Town's argument as to "whether a valid *Touhy* denial can be rendered arbitrary and capricious where the agency agrees to a voluntary limited release of information after-the-fact," as DHS has framed it, DHS Reply at 2, DHS is accurate that neither party has cited a case that resolves this argument directly. Analogously, though, the Supreme Court has stated that "the fact that a local agency representative's preliminary determination is later overruled at a higher

---

[5] *See, e.g.*, *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895 (D.C. Cir. 2015); *United States v. Malik*, No. 15-9092, 2016 WL 3167307, at *4 (D. Kan. June 7, 2016); *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 21 F. Supp. 3d 60, 74 (D.D.C. 2014); *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 20 F. Supp. 3d 260, 265 (D.D.C. 2014); *Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 928 F. Supp. 2d 139, 150-51 (D.D.C. 2013); *Electronic Privacy Info. Ctr. v. TSA*, 928 F. Supp. 2d 156, 166 (D.D.C. 2013); *Friedman v. U.S. Secret Serv.*, 923 F. Supp. 2d 262, 279-80 (D.D.C. 2013); *Anguimate v. U.S. Dep't of Homeland Sec.*, 918 F. Supp. 2d 13, 18-19 (D.D.C. 2013); *Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 892 F. Supp. 2d 28, 46-48 (D.D.C. 2012); *Hussain v. U.S. Dep't of Homeland Sec.*, 674 F. Supp. 2d 260, 270 (D.D.C. 2009).

[6] Notwithstanding this, DHS correctly argues that the cases the Town relies on in support of its deliberative-process-privilege-waiver argument stand only for the proposition that the privilege is waived as to any information previously disclosed by the agency, *not* "as to information **related to** the disclosed information[,] or that the waiver somehow allows for live testimony relating to the disclosed information." DHS Opp'n at 7; *see also Fla. House of Reps. v. U.S. Dep't of Commerce*, 961 F.2d 941 (11th Cir. 1992); *North Dakota v. Andrus*, 581 F.2d 177 (8th Cir. 1978); *Shell Oil Co. v. IRS*, 772 F. Supp. 202 (D. Del. 1991).

agency level does not render the decisionmaking process arbitrary and capricious." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 645 (2007). Although that is not the issue here, the rule supports the common-sense understanding that DHS's decision to later release *some* factual information regarding its denial, as a consideration to the parties, should not render its earlier decisionmaking process—which was final—arbitrary and capricious. While the later-issued Declaration and Affidavit do identify the significant factors that contributed to DHS's decision not to pursue a formal agreement to build the immigration detention facility, those documents ***do not*** explain further or in detail the reasons why DHS decided not to move forward with the proposed immigration detention facility. Additionally, and more importantly, the issuance of the Declaration and Affidavit in early 2016 has no bearing on the reasonableness of DHS's November 2015 denial of the Town's request. The issuance of the Declaration and Affidavit cannot and should not, therefore, open the floodgates to all information or live testimony related to the already-disclosed information. Permitting the Town's request in this situation "could tend to inhibit agencies from making any disclosures other than those explicitly required by law" in the future, *Fla. House of Reps. v. U.S. Dep't of Commerce*, 961 F.2d 941, 946-47 (11th Cir. 1992), and could also set a potentially dangerous and burdensome precedent the Court is unwilling to entertain.

Ultimately, the Town has not carried its heavy burden to establish that there was no reasonable basis for Defendant's denial. Thus, the Court cannot find that DHS's decision to deny the Town's *Touhy* request on this ground was arbitrary and capricious.

### 2. Impartiality and Avoidance of Controversial Issues

Second, the Court agrees that the Town's request would be contrary to DHS's need to maintain impartiality between private litigants and its desire to avoid controversial issues not related to its mission. DHS stated these relevant regulations, 6 C.F.R. §§ 5.48(a)(6) and (8), and detailed the evidence it reviewed that showed "an acrimonious and hostile relationship" between

12

the Town and the City, dating as far back as 2001, "which has resulted in both filing a number of lawsuits against the other over the years." Final Decision Letter at 7. DHS explained that the Town's request for deposition testimony sought only to benefit the state lawsuit the Town filed against the City for breach of contract, to which the United States, DHS, and ICE are not parties and in which the United States, DHS, and ICE have no government interest. *Id.* at 14. DHS sought to remain impartial so that it could "engage both" the Town and the City "in a positive manner in future law enforcement endeavors of mutual interest." *Id.* at 15; *see also id.* ("[DHS] has continuing relationships and enforcement-based activities in both of the localities, the success and efficacy of which in significant part depend on [DHS]'s continuing positive relationship with both."). Should DHS have authorized the Town's request, a consequence of that authorization would be "the very real risk of alienating one or more of these jurisdictions and materially impacting the Agency's continued and necessary relationships across the breath of the Agency's local activities and programs." *Id.* at 16.

Furthermore, given the apparently contentious history between the Town and the City, DHS found it "imperative that the United States, [DHS], and [ICE] not interject itself in this controversy," because whether the City breached a contract with the Town in any way "is wholly unrelated to [DHS] and [ICE]'s mission." *Id.* The Town's initial request had stated that it understood DHS's mission to "include[] determining how to house and detain individuals within its jurisdiction," so DHS's decision as to whether to proceed with the Southwest Ranches facility for this purpose would be related to that mission. *Id.* at 17. But DHS recognized that the Town did not seek purely factual information related to ICE's detention practices, and "[w]hatever public interest there may be in gaining more information as to the decision not to enter into a contract with [the] Town, it is dwarfed by [the] Town's private litigation interest." *Id.*; *see also Davis Enters. v. EPA*, 877 F.2d 1181, 1188 (3d Cir. 1989) ("We do not gainsay that there is a generalized public

13

interest in having public employees cooperate in the truth seeking process by providing testimony useful in litigation."). Given the history between the Town and the City, DHS reasonably elected not to take sides in the underlying litigation.

The Town, however, argues that DHS *did* "directly interject[] itself into the Underlying Litigation" by authorizing the Mead Declaration and Affidavit, which contradicts its stated need to maintain impartiality. This argument does not persuade. The Court will give no weight to the Town's continuous mischaracterization of the Mead Declaration and Affidavit as, for instance, "made in cooperation with only one party to the Underlying Litigation," Town Mot. at 7, or its strong implication that DHS "agreed" with the City to provide Mead's Declaration in exchange for a resolution to the City's APA lawsuit. The record is clear that DHS offered the Declaration and Affidavit (which contained neutral, fact-based lists of the significant factors that contributed to its decision) to both parties equally and simultaneously, and the Declaration and Affidavit are part of the record in the underlying litigation that is equally available to both parties. The fact that the Town wanted DHS to include additional information that DHS refused to include, which resulted in the Town rejecting the offer of the Declaration and Affidavit, does not mean that DHS "injected itself" in the litigation on the City's behalf. Nor does it change the fact that DHS made a rational and fully supported decision to avoid the controversial issues raised in the litigation because those issues between the two municipalities are in no way related to its (or ICE's) mission.[7]

Accordingly, the Court concludes that the Town has failed to meet its burden to establish that DHS's decision in this regard was arbitrary and capricious.

### 3. Undue Burden

Third, the Court agrees that the Town's request would be unduly burdensome on DHS's

---

[7] The Court also rejects the Town's contention that because DHS elected to offer the Declaration and Affidavit, the Town "must be allowed to explore the various averments" made in these documents through deposition testimony. Town Mot. at 10. This argument is little more than a variation of the waiver argument previously rejected.

time and resources. *See* 6 C.F.R. § 5.48(a)(1), (4), (5), (7). DHS stated that making Mead or Moore available would require it to expend time and resources for private purposes, rather than the conduct of Agency business. Final Decision Letter at 18. Moore, especially, had a heavy workload due to his supervisory position, which required that he be available at all times in person, via both non-secure and secure communication. His responsibilities would be unduly burdened should he have to be away in deposition for an indeterminate period of time. *See id.* at 18-20. As to the Town's follow-up request to depose only Mead, who had retired from DHS since 2013, DHS explained that this would be unduly burdensome, as well. Although Mead was retired, permitting his deposition by the Town would require DHS resources to make him available for testimony, "which would require current [DHS] employees to devote time and resources to advise Mr. Mead of the appropriate parameters of his testimony, as well as familiarizing him with an issue that [ICE] publicly decided in June 2012, and bringing him up to speed on the subsequent factual developments in the underlying state litigation, as well as" the two APA lawsuits. *Id.* at 20. DHS worried that granting authorization to depose Mead "might bring a potential tsunami of subpoenas by private litigants and grind government services to a halt." *Id.* at 21.

The Town argues that, by providing Mead's Declaration and Affidavit, DHS's own actions disprove its rationale that compliance with the Town's request would be unduly burdensome. The Court disagrees, as DHS "is in the best position to determine the time and effort involved in preparing [its] employees for their depositions and testimony and how that time commitment might hamper their ability to fulfill their duties." *Debry v. Dep't of Homeland Sec.*, 688 F. Supp. 2d 1103, 1110-11 (S.D. Cal. 2009) (quoting *City of Ashland v. Schaefer*, No. 08-3048, 2008 WL 2944681, at *6 (D. Or. July 31, 2008)). In *Debry*, the plaintiffs, who brought a retaliatory termination claim against their former employer in California state court, made a *Touhy* request to DHS seeking authorization of the testimony of a DHS employee the plaintiffs spoke to during a previous investi-

15

gation of unsafe working conditions. DHS, like it did in this case, denied the request based upon 6 C.F.R. § 5.48(a)(4), (5), and (7), because it reasoned that such testimony "would take undue time of Department employees away from the conduct of official business, expend the resources of the Department for private litigation and have an adverse effect on the performance by the Department of its mission and duties." *Id.* at 1105. The court concluded that DHS's decision was based on a consideration of relevant factors and that DHS articulated a rational connection between the facts and the choice made and, therefore, was not arbitrary and capricious. *Id.* at 1110-11.

Such is the case here with DHS's determination. The Town argues that this rationale is belied by the fact that DHS "cooperat[ed] with the City" to provide them Mead's Declaration and Affidavit. Town Mot. at 11. The Town acknowledges that the preparation of the Declaration and Affidavit clearly do not require the same amount of time and resources that would be required to prepare for a deposition, but it contends, without support or justification, that "any additional time is not so significant or burdensome to justify allowing ICE to provide the Declaration and Affidavit to the City [] and, at the same time, refuse [the Town]'s request." *Id.* at 11-12.

As the Third Circuit previously held in affirming the denial of a *Touhy* request for the deposition of an agency employee:

> Notwithstanding [the] argument that [an agency employee]'s deposition . . . would only take a minimal amount of time, there is no guarantee that cross-examination would not be lengthy. . . . Moreover, [the requesting party]'s argument about the minimal burden in this case fails to take into account the EPA's legitimate concern with the potential cumulative effect of granting such requests. . . . Its concern about the effects of proliferation of testimony by its employees is within the penumbra of reasonable judgment decisions it may make.

*Davis Enters. v. EPA*, 877 F.2d 1181, 1187 (3d Cir. 1989). Although the Town requests a single deposition, an agency may certainly consider the cumulative effect of the request together with all other actual and potential requests. DHS validly considered that a grant of a deposition in this case could lead to future burdens on Department resources.

16

While the Court can agree that the Declaration and Affidavit is not equivalent to live testimony, it defers to DHS's decision to preserve its own resources and avoid spending the time and money of the United States for private purposes. The decision was rational and based on the relevant factors. Consequently, the Court finds that DHS's decision to deny on this ground was not arbitrary and capricious.

### 4. Less Burdensome Source

And fourth, the Court agrees that the Town did not show that the information sought could not have been obtained from a less burdensome source, *i.e.*, the Town's mayor, Jeffrey Nelson. In its Final Decision Letter, DHS, reviewing the Town's first request, noted that the Town stated, "in conclusory fashion and without support, that '[Mead and Moore] to our knowledge have information regarding the fact that water and sewer problems led to the decision to forego [sic] proceeding with the Detention Center.'" *Id.* at 21. DHS had previously announced in a public statement (on June 15, 2012) that it decided it was no longer pursuing a detention facility in Southwest Ranches. *Id.* at 22. And Mayor Nelson testified, under oath, that on either that same day or the previous day, he had discussed—in a telephone conversation with Mead—the reasons for DHS's decision not to go forward with the facility. *Id.* Mayor Nelson also testified that he met with Moore in February 2013 and February 2014, and that the two had discussed the topic of the facility, including "why [DHS] never entered into a legal agreement with [the] Town concerning the facility." *Id.* Based on these statements, DHS concluded that the information requested by the Town was not exclusively held by DHS, but rather possessed also by the Town's mayor. *Id.* DHS explained that Mayor Nelson would be "in as good a position, indeed better—as his recollections of these claimed communications were documented much closer in time to relevant events—as the requested witnesses to testify to these conversations—if in fact they occurred." *Id.* at 23. Because DHS concluded that this information was available from a less burdensome source, it denied the Town's

17

request, pursuant to 6 C.F.R. § 5.48(a)(1).

Upon consideration, the Court concludes that DHS articulated a rational connection based on the relevant regulations on this point. Relatedly, in *Westchester General Hospital, Inc. v. Department of Health & Human Services*, 443 F. App'x 407 (11th Cir. 2011) (per curiam), the Department of Health and Human Services denied a hospital's request to depose, in a state court action, an audit branch manager for an intermediary of the department regarding her role in reimbursement requests. In accordance with its own *Touhy* regulations, the department stated that it "disagree[d] that the information sought is unavailable by any other means" because the parties themselves would be best able to testify vis-à-vis any direct communications they may have had with the branch manager. *Id.* at 410. In affirming the department's decision, the Eleventh Circuit held that its statements "demonstrate it considered the relevant factors, as presented in [the plaintiff]'s letter, and arrived at a rational conclusion that the information was available from other sources." *Id.* at 410.

*Westchester* is on all fours with the situation at issue here. As stated above, DHS expressed in its Final Decision Letter that Mayor Nelson was in a better position than Mead or Moore to testify as to the direct communications he had with Mead and Moore. While the Town "might prefer to depose" Mead and Moore rather than its own mayor, DHS "regulations make no exceptions for party preferences. The regulations inquire only whether the information is otherwise unavailable." *Id.* at 411. Even if DHS was mistaken in its belief that Mayor Nelson possessed the relevant information, or even if this Court would not have interpreted this particular regulation as narrowly as DHS did, the Court "is not to substitute its judgment for that of the agency." *Nat'l Min. Ass'n*, 812 F.3d at 865. And regardless, by merely making the assertion that Mayor Nelson does not possess the information it seeks, the Town does not meet its heavy burden to show that DHS's decision in this regard was arbitrary and capricious.

## IV.  CONCLUSION

The Town may not agree with DHS's assessment or its denial of the Town's request, but neither the Town nor this Court may substitute its judgment for that of DHS. The Court finds that DHS's decision was based on a consideration of the relevant *Touhy* factors, and it articulated a rational connection between those factors, the facts at hand, and the choice it made. Moreover, its decision contained no clear error of judgment. Based on this determination, the Court ultimately concludes that DHS's denial of the Town's request for the deposition testimony of Mead and Moore was not arbitrary and capricious. Accordingly, it is

**ORDERED AND ADJUDGED** that the Defendant's Motion for Summary Judgment [ECF No. 27] is **GRANTED**, and the Plaintiff's Motion for Summary Judgment [ECF No. 29] is **DENIED**.

This action is **CLOSED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 12th day of August, 2016.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE